**GREER TANK & WELDING, INC.,**
**Appellant and Cross-Appellee,**

v.

Louella **BOETTGER,** Administratrix of the Estate of Samuel C. Boettger, Deceased, Appellee and Cross-Appellant.

Nos. 4457, 4495.

Supreme Court of Alaska.

April 18, 1980.

Millard F. Ingraham, Rice, Hoppner, Hedland, Fleischer & Ingraham, Fairbanks, for appellant and cross-appellee.

Roger H. Beaty, Cole, Hartig, Rhodes, Norman & Mahoney, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

PER CURIAM.

The appeal and the cross-appeal in this case both challenge the amount of damages awarded to the plaintiff in a wrongful death action. The appeal, taken by defendant Greer Tank and Welding, Inc. ("Greer"), attacks the trial court's finding that the decedent's divorced wife and nonadopted stepson were "dependents" under AS 09.55.580 of the Alaska Wrongful Death Act. Greer also claims error in the court's computation of the pecuniary loss to the decedent's beneficiaries. The cross-appeal alleges a different error in this computation of pecuniary loss. We affirm the trial court.

Sam and Louella Boettger were married in May, 1965. At the time of her marriage Louella already had a son, Todd, born in July, 1964. While Sam was very devoted to Todd and treated him like his own son, he never formally adopted him, as he felt that formal adoption was unnecessary. In November, 1965, a child, Forrest, was born to the couple. During the next few years, Sam learned to drive trucks and began to make his living as a truck driver.

Sam and Louella were divorced in 1968 because Sam, in order to earn enough money for the family, was away from home too much for Louella. Louella also got the divorce so that she and the children could receive welfare, as all the money Sam was earning then was being plowed back into a truck he jointly owned. After the divorce, Sam sent money irregularly and in various amounts, depending on how he was doing. The couple remarried about a year after the divorce, at least in part because Louella was pregnant with their second child, Danielle. They were divorced a second time in 1972, again because of Sam's job as a long-haul truck driver.

After the second divorce, Louella testified that Sam continued to support his family as he had previously, and would stay with his family for short periods between hauls. Sam's tax returns, however, for the years 1972 and 1973 indicate an address in Portland, Oregon, and Louella was living in Washington during those years. From the spring of 1975 until his death later that year, Sam was living in Seattle with his sick mother. He was not regularly employed but still paid significant sums for Louella's bills.

Sam was killed in British Columbia on September 6, 1975, while en route to Alaska to check out job possibilities. He was a

passenger in a truck driven by an employee of Greer, a corporation doing business in Alaska. Louella, as administratrix of Sam's estate, filed a wrongful death action in Fairbanks against Greer on November 3, 1975. A bench trial was held in June, 1978, and the court ruled in favor of Louella, awarding her and her children $114,846.81,[1] plus interest, costs and fees. Greer moved to amend the court's findings and conclusions, so as to reduce Greer's liability, but this motion was denied. Louella also moved to amend, so as to raise Greer's liability; her motion was also denied. Both parties have appealed on the issue of damages.

Greer's first contention is that Louella and Todd, Sam's stepson, could not be beneficiaries of Sam under the Wrongful Death Act. AS 09.55.580(a) reads, in relevant part:

> When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action, had he lived, against the latter for an injury done by the same act or omission. The action shall be commenced within two years after the death, and the damages therein shall be such damages as the court or jury may consider fair and just, and the amount recovered, if any, shall be exclusively for the benefit of the decedent's husband or wife and children when he or she leaves a husband, wife or children, him or her surviving, or other dependents. When the decedent leaves no husband, wife or children surviving him or her or other dependents, the amount recovered shall be administered as other personal property of the deceased person but shall be limited to pecuniary loss.

Louella does not dispute Greer's contentions that she cannot qualify as Sam's wife under this statute, and that Todd cannot qualify as his child. She argues, though, that she and Todd are "other dependents." We agree.

The appellant in *Brown v. Estate of Jonz*, 591 P.2d 532 (Alaska 1979), raised the same question with regard to the decedent's stepchildren. The majority[2] held that the decedent's widow had not preserved the question for appeal. The dissent disagreed, and analyzed the statute at issue. It concluded that the decedent's stepchildren, who received sole support from the decedent, were "other dependents" within the meaning of the statute. 591 P.2d at 536. The dissent relied upon *In re Estate of Pushruk*, 562 P.2d 329, 331 (Alaska 1977) (footnote omitted):

> In 1960, the statute was amended to its present form. At that time, the legislature added "other dependents" to the class of statutory beneficiaries. Considering the history and purposes of the statute, this amendment appears designed to protect the interest of those who, like children and spouses, will suffer financial loss. The term "dependent" provides for all such persons without creating either an excessively narrow or an overbroad classification. Thus, dependency is a question of fact.

We agree with this construction. Greer has cited to us cases from other jurisdictions holding that "moral" dependents, i. e., those whom the decedent was not legally obligated to support, cannot be the beneficiaries in a wrongful death action.[3] But those cases involve statutes considerably different from Alaska's, and hence are not persuasive.[4] Greer also urges us on policy

---

1. This figure breaks down as follows: $92,-181.75 for direct pecuniary loss to the estate; $5,000.00 each to Louella and the three children for loss of love and companionship; and $2,665.09 for Sam's funeral and burial.

2. *Brown* was heard by a court consisting of then Chief Justice Boochever, Justice Burke and the late Superior Court Judge Peter Kalamarides.

3. *E. g., Vogel v. Pan American World Airways, Inc.*, 450 F.Supp. 224 (S.D.N.Y.1978) (applying California law); *Jones v. Jones*, 270 Or. 869, 530 P.2d 34 (1974).

4. The Oregon wrongful death statute as discussed in *Jones v. Jones*, 530 P.2d at 36, speaks of "widow or widower and dependents." O.R.S. 30.020 (amended in 1973 to read "surviving spouse, surviving children, surviving

grounds to limit the scope of "other dependents" to legal dependents. Otherwise, it argues, the fact-finder "will have to speculate both as to the length of time that decedent would choose to maintain the factual dependency and the amount of damages during that period." We find, however, that this concern is outweighed by the desirability of assuring the protection of the interests "of those who, like children and spouses, will suffer financial loss." *Estate of Pushruk*, 562 P.2d at 331.

■ We believe that the legislature, by adding "other dependents" to the categories of spouse and children, intended to embrace those who occupy a position similar to those in the specified classes and who were actually dependent upon the decedent for support at the time of his death. A showing must be made of actual dependency for significant contributions of support over a sufficient period of time to justify the assumption that such contributions would have continued.

■ Greer, in addition to arguing that legal dependency is required, attacks the factual finding of the trial court that Louella and Todd were dependent on Sam. In order to reverse the trial court on this ground, we must determine that its finding was clearly erroneous.[5] We cannot make such a determination here. Although Sam's contributions to his family were not regular, and varied in amount, we believe that they were sufficient to enable us to uphold the trial court's ruling.

The factual findings of the trial court which are supported by the evidence not only indicate the close familial relationship of Louella and Todd to the deceased, but also their actual dependency upon Sam for support. The court found in part:

21. In addition, Mr. Boettger was providing support for his former wife, Lou Ellen Boettger [sic] as well as her son Todd.

22. It is unrefuted that since the time Lou Ellen and Sam met in 1964, he treated Todd, who was then several months old, in all respects equally as his son and in the same manner as if Todd were his natural son.

. . . . .

25. Throughout this period I find that Sam's relationship with his family remained close and constant regardless of whether a formal marriage certificate was in effect; that decedent frequently took Lou Ellen and their children on trips and outings, spent time with them and generally maintained the relationship of father, husband and friend to them whether technically married or divorced. . . . Whether during the periods of legal marriage or not, Mr. Boettger continued to care for his family; including his wife, both financially by providing money and goods, and emotionally by his presence and activities with them or contacting them.

. . . . .

27. It is impossible to determine an exact monthly average figure representing the cash support provided by the decedent to his family for each and every month or year preceding his death; however, it is unrefuted in the evidence that during the year 1974, the year immediately prior to his death, decedent did provide at a minimum $2,900.00 toward payment for purchase of a house, $800.00 toward payment for purchase of a car, and additional amounts towards payments for various family expenses, clothing and the like. (Testimony of Mrs. Boettger)

We thus hold that the trial court did not err in finding that Louella and Todd were dependents of Sam within the meaning of the Wrongful Death Act. We affirm the awards of $5,000 each to Louella and Todd for loss of Sam's love and companionship, and approve the computation of damages for pecuniary loss based on the premise that Sam had four dependents.

parents and other individuals," 1973 Ore. Laws, ch. 718, § 2, p. 1662).

5. Alaska R.Civ.P. 52(a); *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979), and cases cited therein.

We next consider Greer's challenge to this computation. In order to establish the amount of pecuniary loss, Louella presented testimony by Dr. Eugene Silberberg, an associate professor of economics at the University of Washington. Dr. Silberberg testified that the estimated pecuniary loss to Sam's dependents was about $250,000. He reached this figure by projecting the average annual earnings of a Seattle-based truck driver over Sam's expected remaining years of work, for a total lifetime earnings estimate of $346,531.00. From this estimate Dr. Silberberg subtracted $90,148.00, representing the percentage of $346,531.00 that the head of a family of five living at home would normally spend on himself.[6] Judge Taylor declined to use Dr. Silberberg's projected earnings figures. He apparently believed that the evidence indicated that Sam would not be able to obtain work as regularly as the average Seattle driver, so he projected Sam's lifetime earnings based on his average income for the years 1970, 1972, 1973 and 1974. This yielded a projection of $182,329.75. The judge did, however, find Dr. Silberberg's consumption figures "reasonable," in light of Sam's conservative spending habits and his tendency to indulge his children. He therefore subtracted $90,148.00 from $182,329.75 to produce his figure for pecuniary loss, $92,181.75.

■ Greer challenges Judge Taylor's use of this consumption figure. Greer argues that the evidence clearly establishes that Sam was not the head of a household of five living at home, and that the figure therefore has no validity. It is true that Dr. Silberberg's estimation of Sam's consumption did not take into account his separate residence apart from his family, or his on-the-road expenses as a truck driver,[7] and therefore his estimate of what *percentage* of his income Sam would personally consume was not valid. But Judge Taylor did not use the $90,148.00 figure in this way. Instead he held that it represented a reasonable estimate of Sam's lifetime consumption, when used in conjunction with the lower income figure.[8]

This figure, $90,148.00, represents nearly fifty per cent of Sam's estimated lifetime earnings of $182,329.75. There was no testimony at trial specifically indicating that Sam would personally consume fifty per cent of his income over his lifetime. There was, however, Dr. Silberberg's estimate that Sam, as a married head of a family of five, would personally consume twenty-seven per cent of his income,[9] and an earlier estimate by Dr. Silberberg that Sam, if he were living alone and contributing only to the support of his two natural children, would have spent about sixty-nine per cent of his income.[10] We find that Judge Taylor could reasonably have extrapolated his fifty per cent consumption from these two estimates above, in light of the evidence that Sam had four dependents rather than two, that his spending habits were conservative, and that he was apparently maintaining a separate residence. As we said in *Morrison v. State*, 516 P.2d 402, 405 (Alaska 1973):

> Certainly in many cases, as is true in this case, some items of damage cannot be fixed with mathematical precision. In those instances the trial judge is necessarily forced to estimate and as long as he follows the correct rules of law, and his estimation appears reasonable and is grounded upon the evidence, his finding will remain undisturbed.

6. Dr. Silberberg apparently took into consideration that Sam's children would not continue to be his dependents through all of the years he would be working.

7. There was no testimony indicating that these expenses were picked up by Sam's employers, as is often the case in the trucking industry.

8. Our discussion here disposes of the issue raised in the cross-appeal.

9. $90,148.00 is approximately twenty-seven per cent of $346,531.00.

10. This earlier estimate, made in 1976 before Dr. Silberberg was aware that Sam was still assisting his divorced wife and had a stepson he helped to support, projected lifetime earnings for Sam of $329,995.00 and lifetime consumption of $226,421.00.

The judgment of the trial court is therefore AFFIRMED.

CONNOR and BURKE, JJ., dissent.

CONNOR, Justice, dissenting.

·I am unable to agree that Louella and her son by another marriage, Todd, should be considered "other dependents" under AS 09.55.580(a).

The question might be different if, as in *Brown v. Estate of Jonz*, 591 P.2d 532 (Alaska 1979),[1] a stepchild were living in the home of the deceased, the deceased were the sole source of support for the stepchild, and the parent of the stepchild were still married to the deceased at the time of death. But here I can find no justification for including Louella and Todd within the intendment of the wrongful death statute. At the time of decedent's death there existed no cognizable legal relationship between the decedent and either Louella or Todd.

In my opinion the statutory phrase "other dependents" was meant to cover persons, other than a spouse or children, who have a natural or legal tie to the decedent and who can demonstrate that they were in fact dependent upon the decedent. Most typically this would include parents who were dependent upon the decedent, and it might, in appropriate cases, include grandchildren or collateral relatives. *Cf. In re Estate of Pushruk*, 562 P.2d 329, 331 (Alaska 1977).

Statutes on marriage, divorce and adoption exist so that the very questions presented in this case can be determined with clarity. Absent a legally defined obligation, the trier of fact must speculate both as to the length of time that the decedent would choose to maintain the factual dependency and the amount he would have contributed during that period. When we abandon the structure created by those statutes we create a new, indeterminate class of "dependents" which renders somewhat meaningless the legal concepts of marriage, divorce, and adoption.

In the eye of the law the decedent in this case owed no alimentary obligation to Todd, and his marriage with Louella had been legally terminated. The sporadic contributions made by the decedent were not such that Louella or Todd could afford to rely or depend on them for their support, and could have been terminated at any time.[2] I can find no moral or legal obligation which would justify, on the facts of this case, a finding of dependency. Thus I dissent.

BURKE, Justice, dissenting.

I join in the dissenting opinion of my esteemed colleague, Justice Connor. ·The only thing that I would add is that I think it quite remarkable that Greer should now find itself legally obligated to pay money to persons *to whom the decedent himself owed no such obligation* at the time of his death.

---

1. I did not participate in the decision of that case.

2. When Sam and Louella divorced the second time in 1972, one of the grounds stated for the divorce was nonsupport. After the divorce, Sam never provided a steady or substantial source of support for Louella and Todd. According to Louella's testimony he occasionally paid bills and provided the family with certain necessities, such as appliances and clothing, but she supported herself and her family primarily on her own earnings until she quit her job shortly after Sam's death. Sam left neither a will nor life insurance for Louella or Todd.